**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| RICHARD E. ALLOCCA,<br><br>                              Plaintiff,<br><br>          v.<br><br>WACHOVIA, WACHOVIA INSURANCE<br>SERVICES, INC., WACHOVIA CORP.,<br>WILLIAM BITTNER, JOHN KLUXEN,<br>individually and in their capacities as<br>employees of WACHOVIA,<br><br>                              Defendants. | **OPINION**<br><br>Civ. No. 05-366 (WHW) |

**Walls, Senior District Judge**

Plaintiff Richard E. Allocca filed suit against Defendants alleging state claims for breach of his employment contract and employment discrimination. Defendants countersued alleging breach of contract, breach of duty of loyalty, and tortious interference with economic relationships.

All parties now move for partial summary judgment. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court decides this matter on the basis of the written submissions of the parties. The motions are granted in part and denied in part.

**FACTUAL BACKGROUND**

Plaintiff Richard Allocca is an insurance producer who assists clients in acquiring

NOT FOR PUBLICATION

insurance and services their insurance related needs.  In 1993 Allocca joined a small insurance brokerage company know as Spectrum Insurance Group, Inc. ("Spectrum").  On January 1, 1997, He entered into a Producer Employment Agreement and Purchase Option ("Agreement") with Spectrum.  Defendants, Wachovia, Wachovia Insurance Services, Inc., and Wachovia Corporation (collectively "Wachovia")have become successors in interest to the Agreement.

<u>The Agreement</u>

The Agreement governed the continued employment of Allocca as well as the acquisition of Allocca's insurance business.  Pursuant to Paragraph 9 of the Agreement, employment would terminate on the occurence of any of the following: (1) 365 days following notice of termination for any reason; (2) notice of termination "for cause" given by the Company to the Producer; (3) death of the Producer; (4) disability of the Producer.

Paragraph 10 of the Agreement granted Allocca's employer the option to purchase a 50% interest in his book of business for $465,000.  This option was exercised.  Paragraph 11 of the Agreement provided that in the event the Agreement was terminated for any reason other than death, disability, or retirement, Allocca would be required to purchase Wachovia's interest in Allocca's book of business at a price to be determined in accordance with the formula set forth in Paragraph 12 of the Agreement.  Paragraph 12(a) states:

> The purchase price for the purchase and sale described in paragraph 11(a) shall be an amount equal to 75% of the Commissions earned and received by the Company from the Listed Customers, if the Company has exercised its Purchase Option for the Exercise Prices, or 150% if it has not been so exercised, and 75% of the Commissions earned and received from the Joint Customers, in each case for the 12 full calendar months preceding the day of the Termination Event, and such amount shall be paid in 12 equal quarterly installments commencing 30 days after the date of the Termination event, with interest, payable on such installment dates,

**NOT FOR PUBLICATION**

on the unpaid balance at 7 ½ % per annum.

<u>Changing Employment Policies</u>

Allocca's car lease and cell phone bill were paid by his employer.  Allocca was reimbursed $1,200 each month for his car, and his cell phone bill was invoiced directly to Wachovia.  Since many of Allocca's clients were governmental entities, Allocca made political contributions to support his book of business.  When Allocca worked for Spectrum, he received a separate reimbursement check for each political contribution.  This practice continued until Carl Salerno, Wachovia's controller, and Allocca agreed that Wachovia would increase Allocca's annual payroll by the amount of contributions regularly made rather than directly reimburse each contribution.  Allocca's payroll was increased by $90,000 to cover the $45,000-$50,000 he annually gave in political contributions and to compensate Allocca for any income tax he incurred as a result.

In March 2003 John Kluxen became Wachovia's Chief Financial Officer for its property and casualty line of business in the Northeast Region.  On November 3, 2003, Kluxen sent an e-mail to Allocca advising him that as of November 1, 2003, Wachovia would: 1) cease making the additional $90,000 payroll payment as compensation for his political contributions, 2) reduce his automobile reimbursement from $1,200 to $450 per month, and 3) require Allocca to switch his cell phone account to his name and submit expense reports for his usage.  According to Wachovia, the company's policy at the time prohibited employees from making political contributions on Wachovia's behalf and directed employees to make requests for political contributions through Wachovia's political action committees.  Wachovia also maintains that the

**NOT FOR PUBLICATION**

standard policy for cell phones was to reimburse the producer rather than pay the bill directly. With regard to the car lease, Kluxen determined that $1,200 was an unreasonable reimbursement rate.

Allocca, in contrast, maintains that reimbursement for political contributions, automobile expenses, and cell phone expenses was provided for in the Agreement and that any changes were required to be made in conformance with the Agreement's provisions. Following the e-mail, Allocca, William Bittner, one of Allocca's supervisors, and Kluxen had two meetings where Allocca protested the changes in policy.

Disputes Between Allocca and Wachovia

On January 21, 2004, Allocca's counsel mailed a letter to Mr. Thompson, the Chairman, President, and CEO of Wachovia, outlining allegations against the Defendants for breach of contract, breach of fiduciary duty, defamation, and age and ethnicity discrimination. In response Wachovia sent a letter to Allocca on April 14, 2004 disputing his claims of breach of contract, breach of fiduciary duty, and defamation. The letter indicated that Allocca's claims of discrimination would be investigated internally.

On May 17, 2004, Wachovia, by letter, advised Allocca that his Agreement, but not his employment, would terminate on May 17, 2005, pursuant to Paragraph 9(a) of the Agreement. According to Wachovia, the termination of Allocca's Agreement was part of a company-wide initiative to standardize Company-Producer Agreements. When Wachovia acquired an agency, it generally assumed all of the agency's employment agreements. As a result, it employed producers on terms that were materially different from one another. Wachovia maintains that

-4-

**NOT FOR PUBLICATION**

these differences created profitability and administrative problems.  In the fourth quarter of 2003,

Wachovia decided to standardize the compensation structure by amending or terminating

contracts which were inconsistent with the standard terms.

In late 2004 Kluxen e-mailed Alloccal asking him to explain the business purposes of a

number of charges on his corporate credit card.  In particular, Kluxen was interested in purchases

from Rite-Aid, Landscape Plus, NAIC State Based System, World War II Veterans, Power Mist

Racing, and AAA Life Insurance Company.  Allocca is unable to recall all of the expenses listed

by Wachovia and could not provide a business justification for them.  However, he maintains

that there is no proof that they were not business related expenses.

On December 9, 2004 Allocca instituted this litigation in New Jersey Superior Court,

Morris County, alleging multiple state law claims including breach of the Agreement and

violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.

In late February or early March 2005, Kathleen Reynolds, one of Allocca's customer

service representatives, sent a fax to the Township of Verona, one of Allocca's clients, advising

that the Township's annual risk management fee was past due.  On March 2, 2005, Joe Martin,

the business administrator of the Township, called Ms. Reynolds and stated that he would pay the

fee but wanted to pay it after Allocca "was situated in his new operation and not to Wachovia."

Reynolds Dep. at 7:18-10:25.  Martin also asked Ms. Reynolds whether she "was going to

Richard's new offices."  Id. at 12:2-9.  Reynolds reported this conversation to her supervisors.  In

early March 2005, Stewart McDowell was advised of the telephone conversation between

Reynolds and Martin.

-5-

**NOT FOR PUBLICATION**

On March 11, 2005, Allocca was terminated for "cause."  Wachovia maintains that the decision was made for the following reasons: 1) the threat to Wachovia's interests because Allocca appeared to be asking clients to withhold payments and pay his new agency instead; 2) misuse of the corporate credit card; and 3) a high number of errors-and-omissions claims for which Allocca was responsible.  According to Allocca, he was not informed of the reasons for his termination.  Ten days after his termination, Allocca was employed by Advent Insurance Services ("Advent").

Payment of Risk Management Fees by Allocca's Municipal Clients

Several of Allocca's municipal clients were obliged to pay Wachovia an annual or quarterly risk management fee at the beginning of each calendar year.  At the end of 2004 or in early 2005, Wachovia sent invoices totaling $81,136 to the Township of Mine Hill, Township of Cedar Grove, Township of Verona, Town of Morristown, Township of Mount Olive and Passaic, and Valley Sewerage Commission.  Wachovia has not been paid by any of these clients.  Allocca issued invoices to the same clients on behalf of his new employer, Advent.

Litigation Against Wachovia

Manfra Tordella & Brookes, Inc. ("MTB") has been a client of Allocca's since 1980 and is involved in the shipment of valuable commodities such as gold bullion.  Allocca procured a shipment policy for MTB which provided insurance for goods shipped by MTB.  The insurance coverage was provided by Zurich Specialities London Limited ("Zurich").  The MTB transit policies provided for coverage for the shipment of goods by several different methods.  One method, known as "air freight forwarders," involved shipment by commercial carriers such as

**NOT FOR PUBLICATION**

DHL, Federal Express, and UPS.  The annual premium for these policies was determined by multiplying the value of the goods shipped during the course of a policy period by a specified percentage.  Since each method of shipment carried different levels of risk, the percentage used in calculating the annual premium varied depending on the method of shipment.

On August 18, 2004, Zurich Specialties London Limited ("Zurich") filed a Complaint against Wachovia alleging that MTB paid only 10% of the of the premium for air freight forwarded coverage under two separate policies and consequently owed $580,033.11 in unpaid premiums.  MTB then filed a Complaint against its predecessor in interest, Deep Blue Ventures ("Deep Blue") and Wachovia.  The Third Party Complaint alleges that during the due diligence relating to its acquisition of Deep Blue's assets, Deep Blue and Allocca misrepresented to MTB the percentage to be applied to the value of the goods shipped by the air freight forwarder category when determining the annual premium.  Specifically, the Third-Party Complaint alleges that the written transit policy stated that the annual premium for the air freight forwarder category was 0.95% of the value of goods shipped by that method, but that Allocca told MTB that the actual rate was one-tenth the rate in the stated policy documents.  The Third Party Complaint also alleges that for years, Wachovia covered up the discrepancy between the rate in the stated policy and MTB's understanding of the rate by grossly underrepresenting to Zurich the MTB/Deep Blue shipments using air freight forwarders and shifting that volume of shipment into rate categories that were approximately one-tenth the rate assigned the forwarder category.  Wachovia elected to settle the claims and now seeks indemnification from Allocca.  ___

**PROCEDURAL HISTORY**

-7-

**NOT FOR PUBLICATION**

On December 9, 2004 Allocca filed this suit in New Jersey Superior Court, Law Division, Morris County, alleging multiple state law claims including breach of the Agreement, violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq._, and violations of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA").  Defendants removed the case to this Court on January 19, 2005, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, on the grounds that the Fourth Count of Plaintiff's Verified Complaint alleges a federal claim arising under the Employee Retirement Income Security Act, 29 U.S.C. 1001 et seq. ("ERISA").  Wachovia filed an Answer and Counterclaim on February 11, 2005 and an Amended Counterclaim on September 30, 2005.  The Amended Counterclaim alleges breach of contract (Count I), indemnification (Count II), breach of duty of loyalty (Count III), and tortious interference with economic relationship (Count IV).  The Amended Counterclaim further states a count for a constructive trust (Count V) and asks for a declaratory judgment adjudicating the amount of the purchase price of Allocca's book of business (Count VI).  On October 5, 2005, Allocca filed an Amended Complaint.

On December 5, 2006, the Defendants moved for summary judgment on all counts of the Amended Complaint and on Count VI of the Amended Counterclaim.  On the same day, Allocca moved for summary judgment on Counts I through V of the Amended Counterclaim and on Allocca's breach of contract and wrongful termination claims.  These motions are presently before the Court.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the moving party establishes that "there is no

**NOT FOR PUBLICATION**

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary

judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for

the non-movant and it is material if, under the substantive law, it would affect the outcome of the

suit.  See id. at 248.  The moving party must show that if the evidentiary material of record were

reduced to admissible evidence in court, it would be insufficient to permit the non-moving party

to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

 Once the moving party has carried its burden under Rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts in question."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a

motion for summary judgment, a non-movant must present more than a mere scintilla of

evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The

opposing party must set forth specific facts showing a genuine issue for trial and may not rest

upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d

Cir. 2001).  The material fact or facts become genuine when a reasonable trier of fact could

render a verdict for the non-moving party.  Healey v. New York Life Ins. Co., 860 F.2d 1209,

1219 n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 S. Ct. 2449 (1989).

 At the summary judgment stage, the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and

NOT FOR PUBLICATION

inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271,

277 (3d Cir. 2002).

**DISCUSSION**

**I. Defendants' Motion for Summary Judgment**

    A.  Wrongful Termination Claims

        1.  CEPA Claims - Counts VII, VIII

      The Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA") was

enacted in 1986 to protect employees who "blow the whistle" on organizations engaged in illegal

or harmful activity from retaliation by the employer.  Young v. Schering Corp., 141 N.J. 16, 660

A.2d 1153, 1157 (1995).  CEPA claims are analyzed under the burden-shifting framework set

forth in McDonnell Douglas Corp. v. Greene, 411 U.S. 792 (1973).  Under the McDonnell

framework, the plaintiff must first make out a prima facie case, which raises a rebuttable

inference of discrimination.  Texas Dep't of Comm'n Affairs v. Burdine, 450 U.S. 248, 252-54

(1981).  If the plaintiff succeeds, the burden shifts to the defendant to "articulate some legitimate,

non-discriminatory reason for [the plaintiff's] treatment."  Id. at 253.  The plaintiff must point to

sufficient evidence in the record that the reasons proffered by the defendant were not truthful but

rather "merely a fabricated justification for discriminatory conduct."  Chipollini v. Spencer Gifts,

Inc., 814 F.2d 893, 898 (3d Cir. 1987) (en banc), cert. dismissed, 483 U.S. 1052 (1987).  A

reason "cannot be proved to be a 'pretext for discrimination' unless it is shown that the reason

was false and that the discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509

U.S. 502, 515 (1993) (citations omitted).  At all times, the burden of persuasion remains on the

**NOT FOR PUBLICATION**

plaintiff to prove his case by a preponderance of the evidence.  <u>Burdine</u>, 450 U.S. at 253.

     To establish a prima facie case of retaliation, Allocca must show: "1) that [he] engaged

in a protected activity; 2) that the employer took adverse action against [him], and 3) that a causal

link exists between the protected activity and the employer's adverse action.  <u>Kachmar v.</u>

<u>SunGard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997); <u>Kolb v. Burns</u>, 320 N.J. Super. 467,

727 A.2d 525, 631 (App. Div. 1999).

     Allocca has identified two distinct events as the basis of his retaliation claim.  The first

incident was the termination of the Agreement by notice on May 17, 2004.  The second was the

termination of Allocca's employment for cause on March 11, 2005.  Defendants concede, for

purposes of this motion only, that the first two prongs of the prima facie case are satisfied with

respect to these two acts.  However, they argue that Allocca has not put forth evidence which

establishes the third prong, a causal connection between the protected activity and the adverse

employment action.

     To illustrate a causal link, a plaintiff may rely on a broad array of evidence, including, but

not limited to, temporal proximity and evidence of ongoing antagonism.  <u>Farrell v. Planters</u>

<u>Lifesavers Co.</u>, 206 F.3d 271, 283-84 (3d Cir. 2000).  Wachovia argues, and Allocca concedes,

that timing alone is insufficient to establish a causal connection.  The case law is clear that unless

the timing is "unduly suggestive," it is insufficient to establish a prima facie violation.  <u>Williams</u>

<u>v. Philadelphia Housing Auth. Police Dep't</u>, 380 F.3d 751, 759-60 (3d Cir. 2004); <u>Bowles v. City</u>

<u>of Camden</u>, 993 F. Supp. 225, 264 (D.N.J. 1998).  However, "circumstantial evidence of a

pattern of antagonism following the protected conduct can also give rise to the inference" that the

-11-

**NOT FOR PUBLICATION**

employee's protected activity was the likely reason for the adverse employment action.

Kachmar, 109 F.3d at 177.

Defendants maintain that Allocca cannot demonstrate a causal connection between the two alleged retaliatory acts and any protected activity.  Roughly four months passed between the Thompson letter and Wachovia's notice that it was terminating the Agreement.  Three months passed between the filing of this lawsuit and Allocca's termination for cause.  Allocca counters that in addition to timing there has been "a pattern of harassing and discriminatory conduct" which "connected the retaliatory actions to the protected activity."  Pl. Br. at 13-14.  He maintains that he did not receive necessary office support and that Wachovia began making unilateral changes to the Agreement.  He alleges that following his counsel's letter to Mr. Thompson, no investigation followed.  Instead, he was notified two months later that the Agreement was being terminated.  Allocca filed the instant litigation, and three months later his employment was terminated.

The problem with Allocca's argument is that all of the alleged harassment and discriminatory conduct he cites preceded the protected activities in question – the letter to Thompson and the filing of the lawsuit.  Allocca has failed to state a prima facie case of retaliation under CEPA because the only evidence he advances in support of the causal connection is temporal proximity.  Accordingly, Defendants' motions for summary judgment on Counts VII and VIII are granted.

2.  Breach of Contract Claims - Counts XVI, XXII, XXIII

Defendants ask this Court to dismiss Allocca's breach of contract claims on the grounds

-12-

**NOT FOR PUBLICATION**

that Allocca waived them when he asserted a claim under CEPA.  CEPA contains a waiver

provision that:

> Nothing in this act shall be deemed to diminish the rights, privileges, or
> remedies of any employee under any other federal or State law or
> regulation or under any collective bargaining agreement or employment
> contract; except that the institution of an action in accordance with this act
> shall be deemed a waiver of the rights and remedies available under any
> other contract, collective bargaining agreement, State law, rule or
> regulation or under the common law.

N.J.S.A. 34:19-8 .

The New Jersey Supreme Court has interpreted the statute narrowly.  In Young,

the Court explained that the waiver provision "applies only to those causes of action that

require a finding of retaliatory conduct that is actionable under CEPA" but "does not

apply to those causes of action that are substantially independent of the CEPA claim."  Id.

at 1160.  In Young the court held that the plaintiff's claims for severance pay and

defamation should stand because those issues were "collateral" to the CEPA claim since

they required "different proofs and [did] not require proof of retaliatory motive."  Id. at

22.  In contrast, where state law claims arise from the same set of facts surrounding the

retaliation claim, CEPA prohibits litigating duplicative claims.  See Baldassare v. New

Jersey, 250 F.3d 188, 202 (2001).  In Boyle v. Quest Diagnostics, Inc., the district court

held that a plaintiff's breach of contract for wrongful termination and breach of covenant

of good faith and fair dealing were waived by the CEPA claim because the claims were

substantially related to the CEPA claim.  441 F.Supp.2d 665, 671 (D.N.J. 2006).  The

NOT FOR PUBLICATION

court concluded that the plaintiff's contract claim was based on the employee's disclosure of wrongdoing and that evidence of retaliatory conduct on the part of the employer's management would be necessary to prove bad faith and unfair dealing.

Allocca argues that his claims for wrongful termination are not barred by his CEPA action because they are based upon Wachovia's "violation of the valid, binding Agreement which governed the parties' employment relationship." Pl. Opp. Br. at 21. Allocca maintains that under the terms of the Agreement, he could only be terminated for cause. His Complaint alleges that not only was there no cause, he was never told the cause for his termination. The Court finds that Allocca's contract-based wrongful termination claims are "substantially independent" of his CEPA-based wrongful termination claim because they do not necessarily require a finding of retaliatory discharge. To succeed on this claim, Allocca need only show that Wachovia lacked the requisite cause to terminate him.

Under the Agreement, cause is defined as: (1) loss of insurance license or professional registration, (2) having been convicted of or plead guilty or no contest to any felony or crime involving moral turpitude; (3) having committed a dishonest or fraudulent act causing material harm to the Company; or (4) having materially breached the terms of the Agreement. Agreement, ¶ 9(b). Wachovia argues that the information about the December telephone call from Joseph Martin, as well as its suspicions about improper credit card purchases, provided sufficient cause. Allocca counters that Wachovia never investigated the alleged phone call or allowed Allocca to repay "suspicious" expenses as they had with other producers. Furthermore, Allocca argues that he was never informed of the reasons for termination. The Court finds that

-14-

**NOT FOR PUBLICATION**

there is an issue of material fact regarding whether Wachovia had cause to terminate Allocca.

Accordingly, summary judgment is denied the Defendants on Counts XVI, XXII, and XXIII.

      B.  Hostile Work Environment Claims

             1.  LAD Claims - Counts VI, IX, X, XI

In Counts VI, IX, X, and XI of the Amended Complaint, Allocca claims that he was the victim of workplace harassment based on age and ethnicity.  To establish a prima facie case of a hostile work environment under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD"), Allocca must establish that: 1) the complained conduct would not have occurred but for his age and/or Italian heritage; 2) the conduct was severe or pervasive; 3) enough to make a reasonable person believe that; 4) the conditions of employment have been altered and the working environment is abusive or hostile.  Lehmann v. Toys 'R' US, Inc., 132 N.J. 587, 626 A.2d 445 (1993) (outlining the standard for hostile workplace in the context of sexual harassment); Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998) (applying the Lehmann standard to other types of hostile work environment claims).  The Appellate Division has further held that "an employer whose supervisory employee is acting within the scope of his or her employment [is] liable for the supervisor's conduct in creating a hostile work environment." Heitzman v. Monmouth County, 321 N.J. Super. 133, 728 A.2d 297, 303 (App. Div. 1999).

To defeat summary judgment, Allocca must adduce sufficient evidence from which the fact finder could conclude that the harassing conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Lehmann, 626 A.2d at 445.  Rather than considering each incident alone, the Court must consider

-15-

NOT FOR PUBLICATION

the cumulative effect of all the incidents.  Id.  Factors contributing to a hostile environment

include the frequency and severity of the conduct and whether it was physically threatening or

humiliating.  Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993).  A plaintiff can establish the

requisite level of harm if he demonstrates that the working conditions were affected by the

harassment to a point that a reasonable person would consider the conditions altered.  Lehmann,

626 A.2d at 445.

Between April 2000 and March 11, 2005, Allocca has identified four specific instances in

which ethnic statements were directed at him.  First, in September 2000, John Petillo, a resident

of Wachovia Insurance Services North East, allegedly said to him, "these people don't like olive

oil in their grits."  Second, Allocca alleges that Bittner called him a "mini-guinea" on two

occasions as they passed in the hallway.  Third, Allocca maintains that similar slurs occurred

over the course of his employment, but he is unable to remember the details.  Finally, Allocca

alleges that Kluxen referred to the payment of political contributions as "extortion."  Allocca

maintains that this statement displayed an animus towards people of Italian heritage.

Allocca also claims that he was subjected to discriminatory treatment by Bittner and

Kluxen on account of his age.  He alleges that Bittner suggested that he retire on at least five

occasions.  Allocca further claims that Bittner referred to him as "so 80's" and made a couple of

comments about his "grey beard."  Allocca alleges that he was denied necessary office

accommodations due to his age.  He claims that when he requested a laptop computer in early

2001, Bittner made derogatory comments regarding his age.  Four or five months after his initial

request, Allocca learned from his secretary that other producers had received laptops but that his

-16-

**NOT FOR PUBLICATION**

request had not been processed.  One month later, when he questioned Bittner about the computer, Bittner allegedly said, "You don't need a computer, you don't know what to do with one. . . you are a grey beard. . . you are going to be more trouble than you are worth."  Answers to Interrogs.   Allocca likewise maintains that he was not provided with business cards in a timely fashion or given the necessary clerical support staff.  Finally, Allocca alleges that when he met with Bittner and Kluxen on November 12, 2003 to discuss changes in his contract regarding political contributions and expenses, Bittner said, "If I was as old as you I would retire . . ." Answers to Interrogs.

Defendants argue that the conduct alleged by Allocca falls short of a hostile work environment.  They argue that while it may have been insensitive, it would not have interfered with a reasonable person's work.  See Lehmann, 626 A.2d 445 at 612-13 ("A hypersensitive employee might have an idiosyncratic response to conduct that is not, objectively viewed, harassing.  Allegations of such non-harassing conduct do not state a claim.").  Defendants also argue that the age-related comments, over the course of a six year period, were too infrequent and insufficiently severe to rise to the level of severe or pervasive conduct.

A hostile workplace cannot be established by "epithets which are merely offensive." Heitzman, 728 A.2d at 304.  As the Appellate Division said in Heitzman, "the LAD is not intended to be a general civility code for conduct in the workplace."  Id. (internal quotations omitted).  The Heitzman court determined that eight anti-Semitic comments by supervisors or in the presence of supervisors did not amount to discriminatory changes in the terms and conditions of employment or directly interfere with the plaintiff's performance.  Id. at 304-05; see also

NOT FOR PUBLICATION

<u>Cooper-Nicholas v. City of Chester, Pa.</u>, 1997 WL 799443 (E.D. Pa. 1997) (denying plaintiff's

hostile workplace claims because the sexual comments, which spanned nineteen months, were

not severe or pervasive enough to rise to the level of a hostile workplace).  Similarly, the

comments at issue here span the course of six years and cannot be considered frequent or

chronic.  Comments such as "grey beard," "so 80s" and "over the hill" are also insufficiently

severe.  There is no evidence that Allocca felt physically threatened or humiliated.  The ethnic

and age-related comments did not amount to a hostile work environment.  While the comments

were unprofessional and offensive, they do not rise to the level of offensiveness within the

purview of the LAD.

However, Allocca alleges more than just inflammatory comments; he says that he was

denied necessary office supplies and support on account of his age and ethnicity.  Construing the

facts in the light most favorable to Allocca, a reasonable jury could conclude that this conduct

was sufficiently severe and pervasive to alter the conditions of his employment and create an

abusive work environment, particularly if having a computer is integral to the job.  Similarly, if a

jury concludes that Allocca was denied support staff and business cards on account of his age and

ethnicity, it could conclude that a reasonable person would believe that the conditions of work

had been altered, creating a hostile environment.  Accordingly, summary judgment is denied with

respect to Counts VI, IX, X, and XI.

2.  Individual Liability of Kluxen and Bittner

Defendants argue that even if the Court finds employer liability, Kluxen and Bittner

cannot be found individually liable under CEPA or LAD.  N.J.S.A. 10:3-12a prohibits unlawful

**NOT FOR PUBLICATION**

employment practices and unlawful discrimination by an "employer."  In <u>Tarr v. Ciasulli</u>, the

New Jersey Supreme Court held that an individual supervisor is not an employer under the LAD.

181 N.J. 70, 853 A.2d 921 (2004); <u>see</u> <u>also</u> <u>Hurley v. Atlantic City Police Dep't</u>, 174 F.3d 95,

125 (3d Cir. 1999) (predicting that New Jersey would follow Title VII and refuse to impose

liability on individuals under the statute).

      Although the statute does not provide for direct individual liability, it does prohibit "any

person, whether an employer or an employee" from aiding and abetting a violation of the LAD.

N.J.S.A. 10:5-12e.   The New Jersey Supreme Court has made clear that supervisory employees

may be held personally liable if they aid, abet, incite, compel, or coerce an act in violation of the

LAD.  <u>Tarr</u>, 853 A.2d at 928.  The court defined aiding and abetting according to the

Restatement (Second) of Torts.  Section 876(b) of the Restatement "imposes concert liability on

an individual if he or she 'knows that the other's conduct constitutes a breach of duty and gives

substantial assistance or encouragement to the other to so conduct himself.'"  <u>Tar</u>, 853 A.2d at

929.  However, the alleged principal wrongdoer cannot aid and abet his own wrongful conduct.

<u>Newsome v. Administrative Office of the Courts of the State of New Jersey</u>, 103 F.Supp.2d 807,

823 (D.N.J. 2000); <u>Hurley</u>, 174 F.3d at 126 (noting that aiding and abetting liability may lie for

"harm resulting to a third person from the conduct of <u>another</u>").   Accordingly, Kluxen or Bittner

are only liable if they aided and abetted each other in violating the LAD.

      To determine whether a supervisor is liable for aiding and abetting a violation of the

LAD, courts consider the following factors: (1) the nature of the act encouraged; (2) the amount

of assistance given by the supervisor; (3) whether the supervisor was present at the time of the

-19-

**NOT FOR PUBLICATION**

asserted harassment; (4) the supervisor's relations to the others; and (5) the state of mind of the supervisor.  Tarr, 853 A.2d at 929 (citing Restatement (Second) of Torts, supra, § 876(b) comment d.

Applying these factors and taking all inferences in favor of the Plaintiff, the Court finds that there is a question of material fact regarding whether Kluxen and Bittner aided and abetted each other in violating the LAD.  As example, the Answers to Interrogatories indicate that Allocca overheard Bittner and Kluxen discussing a "plan" to get rid of him at the December 12, 2003 meeting.  Accordingly, summary judgment is denied for Kluxen and Bittner on Counts VI, IX, X, XI, XVI, XXII, and XXIII.

C.  Breach of Contract Claims

1.  Preemption Under LAD - Counts IX - XIV & XVIII

Wachovia argues that Counts IX through XIV and XVIII are preempted by the LAD and should be dismissed.  Count IX alleges that Wachovia violated the Agreement and provisions of the employee manual.  It further alleges that Wachovia violated statutory and common law by failing to investigate allegations for harassment as outlined in the employee manual.  Count X alleges that the Defendants violated Allocca's rights and created a hostile work environment under statutory and common law.  Count XI alleges that Allocca was subjected to unlawful discrimination and unlawful employment practices as a result of his age, national origin, and his reporting discriminatory incidents.  Count XIII specifically alleges that Bittner and Kluxen created a hostile workplace and that Wachovia exhibited willful, reckless, or negligent indifference when made aware of the environment.  Count XIII alleges that Defendants'

NOT FOR PUBLICATION

misconduct caused Allocca emotional distress.  Count XIV alleges that the wrongs committed by

Thompson, Bittner, and Kluxen occurred within the scope of their agency.  Finally, Count XVIII

alleges that Defendants breached the Agreement by failing to act in good faith and by violating

specific contractual provisions.

Defendants characterize these counts as common-law breach of contract claims arising

out of Allocca's allegations of harassment and argue that they are preempted by the LAD.

Allocca, in contrast, argues that the counts are not preempted.  He maintains that Count IX is a

pure breach of contract claim and that claims IX through XIV are additional claims of hostile

workplace that fall inside the LAD.   Both the New Jersey state courts and this Court have

frequently held that the LAD bars common law discrimination claims that are duplicative of the

LAD.  See, e.g., Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 638 A.2d 1341 (App.

Div. 1994) (holding that supplementary common law causes of action may not go to the jury

when a statutory remedy under the LAD exists); DeCapua v. Bell Atlantic-New Jersey, Inc., 313

N.J. Super. 110, 712 A.2d 725 (Law Div. 1988) ("Because plaintiff's common-law breach of

contract claim duplicates his statutory claim under New Jersey's LAD, it is barred."); Mardini v.

Viking Freight, Inc., 92 F.Supp.2d 378, 382-85 (D.N.J. 1999) (dismissing a wrongful termination

claim which involved the same elements of discrimination as the LAD claim); DeJoy v. Comcast

Comm'ns, Inc., 941 F. Supp. 468, 476 (D.N.J. 1996) (finding plaintiff's common law claim

preempted by the LAD where plaintiff provided no information showing his common law claim

was "different or broader" than his LAD claim).

With regard to Count IX, Defendants correctly assert that breach of contact claims based

**NOT FOR PUBLICATION**

on statements in policy manuals are preempted by the LAD when used in an attempt to recover

for discriminatory acts.  In DeCapua, the court held that a claim alleging breach of the

employer's "Equal Employment Opportunity and Affirmative Action" document was duplicative

of and preempted by plaintiff's LAD claim.  712 A.2d at 734.  Similarly, Santiago v. City of

Vineland held that the LAD preempted a breach of contract claim based on an anti-

discrimination policy.  Santiago, 107 F.Supp.2d at 568 (D.N.J. 2000).  This Court concludes that

Count IX is preempted by the LAD and must be dismissed.

Defendants are also correct that Allocca is preempted from bringing supplementary

common law causes of action where the LAD provides a remedy.  However, it is unclear from

the face of the Amended Complaint whether Counts X to XIV are common law claims or LAD

claims because they do not state a specific cause of action.

Allocca's Complaint is hardly a model of clarity or conciseness.  Many of the allegations

in Counts IX through XIV are repetitive of earlier counts or different characterizations of the

same event.  Nevertheless, the counts are sufficient to put Defendants on notice of Allocca's

claim for relief, namely a hostile work environment.[1]  Since a hostile work environment is a

---

[1]The modern rules of notice pleading require only a statement of facts upon which relief
can be granted, not a definitive theory as to the plaintiffs' theory of the case.  La Raza Unida of
So. Alameda County v. Volpe, 440 F. Supp. 904, 912 n.20 (N.D. Cal. 1977).  As the Seventh
Circuit said in Bennet v. Schmidt, "having stated a discrimination claim the complaint need not
offer specifics about which rules of law, state or federal, racial discrimination offends."  153 F.3d
516, 519 (7th Cir. 1998).  Moreover, "[a]ll pleadings shall be construed so as to do substantial
justice."  Fed. R. Civ. P. 8(f).

Rule 8 of the Federal Rules of Civil Procedure requires that a Complaint contain a short
plain statement of jurisdiction, a short plain statement of the claim showing that the pleader is
entitled to relief, and a demand for judgment for the relief the pleader seeks.  Fed. R. Civ. P. 8(a).
Under the relaxed standards of notice pleading, a Complaint need not identify a legal theory or

**NOT FOR PUBLICATION**

claim upon which relief can be granted under the LAD, the Court will not dismiss Counts IX

through XIV.  However, to the extent that Allocca seeks to state a claim under New Jersey

common law in Counts IX through XIV, he is preempted from doing so.

      As to Count XVIII (breach of the Agreement), the Court finds that the actions that form

the basis of this claim are separate and apart from the actions that establish Allocca's LAD

claims.  As example, Allocca argues that Wachovia made unilateral changes to the Agreement in

direct violation of Paragraph 22 of the Agreement.  Therefore, the motion to dismiss Count XVIII

is denied.

> 2**.**  Counts I-V, XVI, XVIII, XX, XXII

Counts I and III assert that Wachovia breached the Agreement with respect to

compensation.  Count II alleges that Wachovia breached the Agreement by not consulting

Allocca on matters involving joint customers and by not providing Allocca with the service

personnel as required by the Agreement.  Count IV alleges that Wachovia violated the

Agreement with respect to benefits.  Count V alleges that Wachovia violated the Agreement with

respect to reimbursement of reasonable expenses.

Count XVI alleges that Defendants "wrongfully, without cause or explanation and in

breach of the Employment Agreement, terminated Plaintiff's employment."  Count XVIII alleges

that Defendants breached the Agreement by "failing to act in good faith and by violating specific

contractual provisions."  Count XX alleges that Defendants violated the Agreement by not

---

cause of action. See Bennet, 153 F.3d at 519 (stating that the fundamental difference between
notice pleading and the former code pleading is that notice pleading does not require the pleader
to state a specific cause of action).

**NOT FOR PUBLICATION**

paying him commissions earned through the date of termination. Count XXI alleges that Defendants breached the Agreement and violated the Court's order by continuing to contact Allocca's clients after its termination. Finally, Count XXII alleges that Plaintiff has violated the Agreement by not providing cause for Plaintiff's termination.

In their motion for summary judgment, Defendants do not specifically address the individual counts. Instead, they quote Allocca's answer to Interrogatory 8 in which he was asked to identify all breaches of the Agreement. His answer incorporated his response to Interrogatory 6 (which asked him to identify all incidents of discrimination or harassment) and listed two additional events: 1) failing to provide him with files and records according to the terms of the contract; and 2) continuing to contact his clients following termination. Defendants only address those two events.

The purpose of a summary judgment motion is to dispose of factually unsupported claims or defenses. A defendant moving for summary judgment bears the initial burden of showing that "there is an absence of evidence to support the moving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. With regard to Counts I through V, XVI, XX, and XXII, the Defendants have not met their burden. They simply ignore these claims. Accordingly, the Court only considers Defendants' motion for summary judgment on Count XVIII (breach of the Agreement by failing to act in good faith) and Count XXI (solicitation of Plaintiff's clients in violation of Agreement and Order).

Pursuant to paragraph 13(b) of the Agreement, Wachovia was required to "promptly" deliver the client files to Allocca following a termination event. Wachovia maintains that

**NOT FOR PUBLICATION**

Allocca did not allow a reasonable amount of time to photocopy the files and produce them, but instead rashly filed an emergent application, two days after termination, seeking to compel their production.  Wachovia therefore disputes that it breached the Agreement by failing to "promptly" produce the files.  Allocca counters that following his termination, he was escorted from the building and not allowed to recover his personal belongings or customer files.  He maintains that his attorney was promised that some of his files would be ready by March 12, 2005, but that Wachovia failed to comply with this promise.  The Court finds that there is an issue of material fact regarding whether Wachovia breached the Agreement with respect to delivering the files. The Complaint does not specifically allege that Wachovia failed to promptly provide Allocca with his customer files, but Count XVIII, which alleges that Wachovia failed to "act in good faith and by violating specific contractual provisions," encompasses this allegation.   Accordingly, summary judgment is denied with respect to Count XVIII.

        With respect to Count XXI, Wachovia argues that there is no admissible evidence to support the allegation that Wachovia improperly solicited Allocca's clients.  It maintains that the statement in his certification that "[m]any customers also stated that they had received solicitation calls from Wachovia employees" is impermissible hearsay.   However, Federal Rule of Civil Procedure 56(e) requires only that the supporting *facts* would be admissible in evidence. As the Supreme Court stated in Celotex, "We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.  Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses."  477 U.S. at 324; see also Williams v. Borough of West Chester, PA, 891 F.2d 458,

NOT FOR PUBLICATION

466, n.6 (3d Cir. 1989) (holding on authority of <u>Celotex</u> that hearsay evidence produced in an

affidavit opposing summary judgment may be considered if the out-of-court declarant could later

present that evidence through direct testimony at trial).  Here, Allocca's statement that his clients

claimed that they had been solicited by other customers is hearsay.  However, these clients could

be called to testify at trial and their testimony would be admissible.  The Court finds that there is

an issue of material fact regarding whether Wachovia breached the Agreement by contacting

Allocca's clients after termination.  Summary judgment on Count XXI is denied.

     C.  ERISA - Count IV

     Count IV of the Amended Complaint alleges that Wachovia breached the Agreement by

not providing him with cost-free group life, health, and dental plans and by not paying 50% of

his disability insurance.  Wachovia moves for summary judgment on the grounds that Count IV

is preempted by ERISA and there is no basis for finding a violation of ERISA.  Allocca did not

respond.

     This Court has previously determined that Allocca's common law contract claim is

preempted by ERISA.  <u>See</u> November 3, 2005 Opinion.  Accordingly, the issue is whether

Allocca has stated a claim under ERISA that can withstand summary judgment  Wachovia makes

a minimal showing in support of its motion for summary judgment.  It merely states that Allocca

testified that he did not know if Wachovia deviated from the documents governing the benefit

plans at issue.  The Court finds that Wachovia has not met is burden.  The fact that the employee

could not recall the terms of the plan documents does not, without more, establish that "there is

no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

NOT FOR PUBLICATION

Fed. R. Civ. P. 56(c).  Accordingly, summary judgment with respect to Count Four is denied.

      D.  Tortious Interference Claim - Count XVII

Count XVII asserts a claim for tortious interference.  Specifically, the count alleges that Allocca lost the patronage of five clients – IBI Armored Company, Millennium Automotive, Eastern Armored, Cerdel Construction Co., and Panda Corp. – because Defendants failed to provide Allocca with the client files according to the terms of the Agreement.

In order to establish a claim for tortious interference, the plaintiff must demonstrate: (1) a contract of protectable right; (2) interference done intentionally and with malice; (3) causation of a loss; and (4) damage.  Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 563 A.2d 31, 37 (1989).  The New Jersey Supreme Court stated in Printing Mart-Morristown v. Sharp Electronics Corp. that "it is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."  Id.  As the court explained, tortious interference developed at common law to protect parties to a contract from outside interference.  In contrast, where a person interferes with the performance of his own contract, liability is governed by contract law. Id. at 38.  In Mandel v. UBS/Painewebber the appellate court affirmed the dismissal of the brokers' claim that their former employer had tortiously interfered with the brokers' client relationships.  373 N.J. Super. 55, 860 A.2d 945 (App. Div. 2004).  The court concluded that since both the employer and brokers had a relationship with the clients at issue, the plaintiffs could not maintain an action for tortious interference against the employer.

Allocca's tortious interference claim is based on Wachovia's alleged failure to "provide

NOT FOR PUBLICATION

plaintiff with the client files according to the terms of the Agreement."  Allocca argues that this

failure caused him to lose five clients.  Wachovia and Allocca are parties to the Agreement.

Allocca has failed to allege tortious interference because under New Jersey law, a party to a

contract cannot tortiously interfere with it.  <u>Printing Mart Morisstown</u>, 563 A.2d at 37.

Accordingly, Plaintiff's claim of tortious interference is dismissed.

Allocca's claim is more properly characterized as a contract claim and the Court will treat

it as such.  The Court finds that there is an issue of material fact regarding whether Wachovia

provided Allocca with the client files according to the terms of the Agreement.  Accordingly,

summary judgment is denied on Count XVII.

E.   Counts XV, IXX, and XXIV

Next, Wachovia asks the Court to dismiss Counts XV, IXX, and XXIV.  Count XV

alleges that Bittner offered to sell Allocca's book of business to Donald Readlinger and that this

act constituted an interference with a potential economic benefit because Allocca owns half of

the book of business.  Plaintiff asks for an injunction barring Wachovia from entering into

discussions concerning Allocca's book of business until a judicial determination is made with

respect to the rights of the parties.  Wachovia points out that the count should be dismissed

because there is no evidence that Bittner told Readlinger that Allocca's book was "available and

could be bought."  Wachovia argues that this allegation was made "on information and belief"

and that there is no evidence in the record to support it.  Allocca responds by pointing to his

Certification in which he states that Donald Readlinger himself informed him of the meeting with

Bittner.  Readlinger may be called to testify at trial.  Accordingly, there is an issue of material

**NOT FOR PUBLICATION**

fact.  Summary judgment is denied on Count XV.

Count IXX alleges that Wachovia violated the Court's March 18, 2005 Order "not to solicit any clients of plaintiff in accordance with paragraph 17(b) of the Producer Agreement." Specifically, the Count states that on March 23, 2005, Steve McDowell was on the phone with plaintiff's counsel and brought a representative of IBI Armor onto a three-way call.  Wachovia maintains that discovery has shown that the conversation between Allocca's counsel, Wachovia's counsel, and the representative from IBI Armored was an effort to resolve issues raised in discussions."  See Answers to Defendants' Set of Interrogatories.

Allocca does not address Counts IXX  in his brief opposing summary judgment.  The nonmoving party may not rest on his pleadings to defeat a motion for summary judgment but must come forward with evidence that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  Allocca has not met his burden.  Since there is no evidence that Wachovia solicited IBI Armored, summary judgment is granted and Counts IXX is dismissed.

Count XXIV alleges that Defendants continued to harass Allocca following his termination.  Specifically, it alleges that there was an error when his executive compensation accounts were liquidated after his termination.  The Complaint notes that the error was corrected after two weeks.  Defendants argue: 1) that it was an administrative problem; and 2) that since there was no employer/employee relationship at the time, there is no basis for liability under the LAD or CEPA.

Employer retaliation can be actionable even if it occurs after the employee is no longer in the workplace.  In Burlington Northern & Santa Fe Railroad Company v. White, the Supreme

**NOT FOR PUBLICATION**

Court held that under Title VII, acts of retaliation are not confined to those occurring in the workplace. 126 S. Ct. 2405, 2409 (2006). Rather, retaliatory actions by an employer are actionable if they "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id.[2] Here, the error in executive compensation occurred after Allocca was terminated for cause. The Court notes that Defendants do not point to any evidence in the record which would indicate that the error in compensation was merely an administrative error. Therefore, Defendants have failed to meet their burden under Celotex to demonstrate that no material issue of fact exists for trial. Accordingly, summary judgment is denied.

    F.  Declaratory Judgment - Counterclaim VI

    Defendants move for summary judgment on Count VI of its Amended Counterclaim seeking declaratory judgment for the amount owed by Allocca for purchase of Wachovia's interest in Allocca's book of business. Paragraph 11(a) of the Agreement provides:

> Upon the occurrence of a Termination Event described in paragraph 9(a)(i) or 9(a)(ii), [Allocca] shall purchase and be deemed to have purchased and [Wachovia] shall sell and be deemed to have sold all of [Wachovia's] interest in all of the Joint Customers and, after allowing for [Wachovia's] exercise, if any, of the Purchase Option at the Exercise Price, the Listed Customers for the purchase price set forth in paragraph 12(a) and on the terms and conditions set forth herein.

There is no dispute that the Purchase Option referred to in paragraph 11(a) was

---

[2] New Jersey's policy is to look to Title VII for guidance when interpreting provisions of the LAD and to federal precedent governing Title VII as a key source of interpretative authority. Therefore, this Court views Burlington Northern as persuasive authority and concludes that retaliation may be actionable even if it occurs outside of the workplace setting.

NOT FOR PUBLICATION

exercised by one of Wachovia's predecessor's in interest.  Wachovia maintains that there

is no dispute that a termination event described in 9(a)(ii) occurred.  Therefore,

Defendants argue that Allocca is required to pay the purchase price for the Listed

Customers and Joint Customers.

      Allocca opposes summary judgment, arguing that there are issues of material fact

to be determined by the Court.  Allocca maintains that his termination "for cause" is

absolutely in dispute.  In their Reply, Defendants argue that Allocca is judicially estopped from

arguing that he was not terminated pursuant to 9(a)(ii) because the triggering of that provision

was his basis for receiving injunctive relief in his application for an Order compelling Wachovia

to turn over customer files.  See Brief in Support of Plaintiff's Order to Show Cause.  Defendants

rely on In re Armstrong World Indus., Inc., which holds that "judicial estoppel can be applied

when a party asserts a certain position in a legal proceeding and prevails, only to assert a contrary

position later because of changed interests."  432 F.3d 507, 517 (3d Cir. 2005).

      The Supreme Court has enumerated several factors which determine whether the doctrine

applies: (1) whether the later position is "clearly inconsistent" with its earlier position; (2)

whether the party has succeeded in persuading a court to accept that party's earlier position so

that judicial acceptance of an inconsistent position in a later proceeding would create the

perception that the earlier court was misled; and (3) whether the party seeking to assert an

inconsistent position would derive an unfair advantage or impose an unfair detriment on the

opposing party if not estopped.  New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).  Here,

NOT FOR PUBLICATION

Allocca's position is not clearly inconsistent with his earlier position.  In his Brief in Support of Plaintiff's Order to Show Cause, Allocca states that he was told he was terminated for cause but was not given a reason.  Instead, he was told he would be provided a reason within thirty days. Such a statement is not inconsistent with Allocca's current argument that Wachovia did not have a proper reason and that his termination was therefore invalid.  Nor is this a case where there is the perception that the Court was previously misled or where Allocca derives unfair advantage from asserting that there was no cause.  Accordingly, Allocca is not judicially estopped from challenging the basis of his termination.

As discussed, the Court finds that there is an issue of fact regarding whether Wachovia made a good faith determination that one of the events justifying termination "for cause" had occurred.  If a jury concludes that Allocca was properly terminated for cause, the termination would trigger Paragraph 11(a) and Wachovia would be entitled to a declaratory judgment.[3] However, if a jury determines that Wachovia was not terminated for cause but for some impermissible reason, Paragraph 11(a) would not be triggered.  Because there is a material issue of fact regarding whether there was cause, summary judgment as to Count VI of the Counterclaim is denied.

**II. Plaintiff's Motion for Summary Judgment**

A.  Breach of Contract and Wrongful Termination Claims

---

[3]Paragraph 11(a) of the Agreement governs the purchase of Allocca's book of business if a termination event occurs pursuant to paragraph 9(a)(I) (termination with 365 days notice)  or 9(a)(ii) (termination for cause).

NOT FOR PUBLICATION

Allocca seeks summary judgment on his breach of contract and wrongful termination claims, contending that there are no legitimate factual disputes concerning whether Wachovia had "cause" to terminate him as that term is defined in the Agreement.  As evidence, Allocca points to the fact that Robert Metz, the individual who conducted the termination discussion with Allocca on March 11, 2005, said in his deposition that Allocca was being terminated for violating the code of ethics but could not identify the specific violation.  Bittner and Kluxen, Allocca's immediate supervisors, also testified that they did not know why Allocca was fired. Allocca maintains that he was never given a reason for his termination.

In opposition, Wachovia argues that Allocca's motion should be denied on the grounds that Allocca waived any claim for wrongful termination by asserting a claim for retaliatory discharge under CEPA.  However, as discussed earlier, the Court finds that Allocca did not waive his contract-based wrongful termination claims because they are "substantially independent" of his CEPA-based wrongful termination claim.  Therefore, the Court must determine whether there is an issue of material fact with respect to the breach of contract and wrongful termination claims.

Under the Agreement, Allocca could be terminated for cause without notice.  "Cause" is defined to include, among other things, Wachovia's good faith belief that Allocca had (1) "committed [a] dishonest or fraudulent act causing material harm or detriment to the Company"; or (2) "materially breached the terms of the [A]greement."  Agreement at ¶ 9(b)(iii) and (iv)). Wachovia maintains it terminated Allocca because it had information that suggested that Allocca was soliciting clients on behalf of his new firm and encouraging them to withhold payment.

-33-

NOT FOR PUBLICATION

They also allege that Allocca made personal purchases with the corporate credit card.  As

discussed previously, the Court concludes that there is an issue of material fact regarding whether

Wachovia had cause to terminate Allocca.  Accordingly, the motion for summary judgment on

the breach of contract and wrongful termination claims is denied.

     B.  Counterclaim II: Indemnification

     Counterclaim II alleges that Allocca is responsible for indemnifying Wachovia for any

liability it incurs in the *Zurich* Matter and any litigation it incurs in defending the *Zurich* Matter.

Plaintiff moves for summary judgment on the grounds that an employer may not seek indemnity

from an employee for acts of negligence under New Jersey State law.  Allocca argues that even if

he were negligent in providing a handwritten rate quote to MTB, the negligence does not trigger

a duty to indemnify.  Allocca also argues that he is not liable because he was not involved on a

day-to-day basis with managing the account.  Allocca further asserts that Wachovia has not

established that Plaintiff committed a fraudulent or dishonest act.

     Wachovia, in contrast, maintains that its claim for indemnification is not based on

negligence, but rather on fraud.  In support of its allegation of fraud, Wachovia points to the

annual audit reports between 1996 and 2002 which contained an air freight forwarded shipment

value that was approximately 10% of the shipment value reported by MTB.  Wachovia indicates

that there is evidence linking Allocca to the preparation of the altered reports.  Specifically,

Wachovia notes that Allocca personally approved the invoice for the 1996-97 policy based on a

modified audit showing drastically reduced shipment value for the air freight forwarder carrier.

A fax from Allocca to David Shulman of MTB indicated that he had "reviewed the numbers."

**NOT FOR PUBLICATION**

Wachovia also points to a handwritten note from Allocca to Masucci asking her to "retype-recalculate" an MTB audit report and return the report to him.

Under the general rules of agency, an agent who acts in an unauthorized manner and subjects his principal to liability because of a negligent or other wrongful act is subject to liability for the resulting loss.  Restatement (Second) Agency § 401.  In 1961, the New Jersey Supreme Court suggested that the rule was anachronistic insofar as it permitted an employer, liable to a third party for the negligence of an employee under the doctrine of *respondeat superior*, to recoup the loss from the negligent employee.  Eule v. Eule Motor Sales, 34 N.J. 537, 170 A.2d 241, 242 (1961).  In the context of liability incurred as a result of negligence in operating a motor vehicle, the court reasoned that negligence is often the matter of split-second inadvertence and that an employee should not bear the burden of predictable incidence of negligent harm.  In Brown v. United Cerebral Palsy/Atlantic & Cape May, the Superior Court interpreted Eule to mean that New Jersey law "prohibits an employer from recouping from an employee any sums the employer may be required to pay to a third party as a result of the employee's negligence." 278 N.J. Super. 208, 650 A.2d 848, 850 (Law Div. 1994).  However, the court was careful to limit its discussion to negligence and made clear that the rule does not apply to intentional acts.  Id. at 850, n.2.  Similarly, in Fried v. Aftec, Inc., the Appellate Court distinguished between acts of negligence in which an employer could not hold an employee liable for corporate losses resulting from negligence and acts of fraud.  264 N.J. Super. 245, 587 A.2d 290, 297-98 (App. Div. 1991).

The Court finds that there is an issue or material fact regarding how involved Allocca was

**NOT FOR PUBLICATION**

in the preparation of the audit reports and whether or not he committed fraud.  Accordingly, the motion for summary judgment is denied with respect to Counterclaim II.

     C.  Counterclaim I : Breach of Contract

Counterclaim I alleges that Allocca breached the Agreement by refusing to pay Wachovia amounts due under the Agreement such as the Cumulative Excess Draw, the Cumulative Loss, and the Purchase Price.  The Count further alleges that Allocca breached the Agreement by failing to comply with applicable laws, rules, and regulations in his dealings with MTB.

     Allocca's motion does not address allegations in the Count that he breached the Agreement by failing to pay for his book of business, for the excess draw, and for his share of losses incurred by the profit center.  With respect to this portion of the Count, Allocca has failed to meet his burden under Fed. R. Civ. P. 56.

     With respect to the first part of the Count, Allocca argues that Wachovia has not produced any evidence of Allocca's liability in the litigation instituted by MTB.  Defendants counter that Allocca's alleged fraudulent manipulation of the MTB documents, as discussed, amounts to common law fraud and therefore breach of contract.  Defendants also maintain that Allocca's actions were in violation of New Jersey insurance law.  Specifically, N.J.S.A. 17:22A-40(a) provides that an insurance producer may lose his license if he engages in any of the following acts: (1) "[i]ntentionally misrepresenting the terms of an actual or proposed insurance contract, policy or application for insurance; (2) "[u]sing fraudulent coercive or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility in the

**NOT FOR PUBLICATION**

conduct of insurance in this State or elsewhere"; and (3) "[c]ommitting any fraudulent act." N.J.S.A. 17:22A-40(a)(5), (8), (16).  There is a material dispute of fact regarding whether Allocca intentionally manipulated the MTB documents.  Accordingly, summary judgment is denied.

> D.  Counterclaim III: Breach of Duty of Loyalty

Counterclaim III alleges that Allocca breached his duty of loyalty to Wachovia by instructing, encouraging, or inducing Wachovia's customers to withhold payments due to Wachovia or by otherwise acquiescing in such actions.

An employee has a duty of loyalty to his employer.  Lamorte Burns & Co., 167 N.J. 285, 770 A.2d 1158, 1169 (2001).  This duty requires an employee to refrain from privately soliciting the employer's customers while still employed and prohibits an employee from taking affirmative steps to injure the employer's business.  Id. at 1169-70.  At the same time, courts recognize that an employee has the right to "plan and prepare for future employment."  Id. Allocca argues that he did not breach his duty of loyalty because he did not solicit any business away from Wachovia while employed.  He maintains that he simply notified his long time customers that he would be changing his situation.

Wachovia does not dispute that Allocca had a right to prepare for departure by notifying his clients that he would be changing employment.  Rather, they argue that Allocca breached his duty of loyalty while employed by encouraging Wachovia's customers to withhold payment.  In support of their allegation, Wachovia points to the following facts in the record: (1) Allocca

**NOT FOR PUBLICATION**

began preparing to leave Wachovia in May 2004; (2) Martin's telephone call with Reynolds advising her that he wanted to pay the risk management fee when Allocca "was situated in his new operation and not to Wachovia," Reynolds Dep. At 7:18-10:25; (3) Wachovia clients who did not pay their annual risk management fees due at the beginning of 2005, Kluxen Decl. at ¶¶ 2-8; and (4) those same clients who paid these fees to Advent when Allocca joined the company. See, e.g., Walsh Decl. Allocca argues that he did not advise his customers not to pay their invoices. He notes that many customers paid the entire fee to Wachovia and suggests that some customers simply chose to pay Advent rather than Wachovia.

The Court concludes that there is an issue of material fact regarding whether Allocca directed his customers to withhold payment from Wachovia and pay Advent instead. Accordingly, summary judgment is denied with respect to Counterclaim III.

E. Counterclaim IV - Tortious Interference of Economic Relationship

Counterclaim IV alleges tortious interference of economic relationship. Wachovia alleges that Allocca, on behalf of his new employer Advent, instructed, encouraged, or otherwise induced Wachovia's customers to breach their obligations to Wachovia and instead pay Allocca or Advent debts that were due to Wachovia.

To repeat, in order to establish a claim for tortious interference, the counterclaimant must demonstrate: (1) a contract of protectable right; (2) interference done intentionally and with malice; (3) causation of a loss; and (4) damage. Printing Mart-Morristown, 563 A.2d at 37.

Allocca asks the Court to grant summary judgment on the grounds that there was no

**NOT FOR PUBLICATION**

reasonable expectation of economic advantage or protectable right since Allocca was working

from his own book of business.  However, Allocca mischaracterizes the nature of Defendants'

claim.  Defendants do not charge that Allocca tortiously interfered with Wachovia's economic

advantage by taking his clients with him when he left.  Rather, Defendants claim that Allocca

interfered with the contractual obligation of several of Allocca's municipal clients to pay risk

management fees owed to Wachovia for the portion of 2005 when Allocca was still working at

Wachovia.  These risk management fees were due on either December 31, 2004 or January 1,

2005.  The risk management fee was to pay for services rendered during the year of 2005.  It is

undisputed that the municipal clients were obligated to pay Wachovia a pro-rated fee for the  two

months in which Allocca was at Wachovia, from January 1, 2005 to March 11, 2005.

Defendants allege that the municipal clients did not pay any fees to Wachovia because

Allocca issued the invoices to the same clients on behalf of his new employer.  There is evidence

that these clients were billed by Advent for 2005 and were not charged a prorated fee.

Defendants also point to an e-mail that Allocca sent to Mine Hill which incorrectly represented to

the client that this Court had directed Mine Hill to pay Advent the 2005 fee.  The alleged damage

to Wachovia is the loss of the risk management fees.  In his deposition, Allocca denies advising

or inducing clients not to pay Wachovia the fees owed to them.

The Court concludes that there is an issue of material fact regarding whether or not

Allocca intentionally induced his clients not to pay the fees owed to Wachovia, thereby

interfering with Wachovia's contractual relationship with these clients.  Accordingly, summary

judgment is denied with respect to Counterclaim IV.

**NOT FOR PUBLICATION**

      F.  Counterclaim V - Unjust Enrichment

      Counterclaim V alleges that Advent and Allocca have received payments from customers that should have been paid to Wachovia.  The claim alleges unjust enrichment and requests a constructive trust to be imposed on payments received by Allocca and/or Advent.

      A constructive trust is a remedial device to prevent unjust enrichment.  SEC Commission v. Antar, 120 F.Supp.2d 431, 447 (D.N.J. 2000).  To establish the need for a constructive trust, the requesting party must prove that there was "some wrongful act, usually, though not limited to fraud, mistake, undue influence. . . which has resulted in the transfer or property."  D'lppolito v. Castoro, 51 N.J. 584, 242 A.2d 617, 619 (1968).  Allocca argues that summary judgment should be granted to him because Defendants cannot establish wrongful conduct on his part.  Defendants do not address Counterclaim V in its brief.  However, since there are issues of material fact regarding the breach of duty of loyalty and tortious interference of economic relationships claims, summary judgment is denied.

**CONCLUSION**

      Defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's motion for summary judgment is denied.  An appropriate order will follow.

                                        **s/ William H. Walls, U.S.S.J.**